Law Offices of
**MICHAEL W. CARMEL, LTD.**
80 East Columbus Avenue
Phoenix, Arizona 85012-2334
Telephone: (602) 264-4965
Arizona State Bar No. 007356
Facsimile: (602) 277-0144
E-mail: Michael@mcarmellaw.com

Attorney for Debtors

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>THE MEDICAL DIAGNOSTIC IMAGING GROUP, LTD., an Arizona Professional Corporation<br><br>MDIG OF ARIZONA, LLC, an Arizona Limited Liability Company<br><br>Debtors. | Chapter 11 Proceedings<br><br>Case No. 2:19-bk-15722-DPC<br>Case No. 2:19-bk-15726-BMW<br><br>(Jointly Administered)<br><br>**DECLARATION OF PATRICK SANTORE IN SUPPORT OF FIRSTDAY PLEADINGS** |
| THIS FILING APPLIES TO:<br>    X All Debtors<br>    ☐ Specified Debtors: | |

I, PATRICK SANTORE, hereby declare as follows:

1. I am the Chief Executive Officer ("<u>CEO</u>") of THE MEDICAL DIAGNAOSTIC IMAGING GROUP, LTD. ("**MDIG**") and MDIG of Arizona, LLC ("**MDIG AZ**") (collectively, the "<u>Debtors</u>"). I am intimately familiar with the Debtors' business, day-to-day operations and financial affairs.

2. On December 16, 2019 (the "<u>Petition Date</u>"), the Debtors each filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended or modified, the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the District of Arizona (the "<u>Bankruptcy Court</u>") initiating the above-captioned chapter 11 cases (the

"Chapter 11 Cases"). The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

3. In order to enable the Debtors to minimize the adverse effects of the commencement of the Chapter 11 Cases on their business operations, the Debtors are requesting various types of relief in certain "First Day" motions (each, a "First Day Motion" and collectively, the "First Day Motions"). The First Day Motions seek relief aimed at, among other things: (i) authorizing the Debtors to utilize cash collateral, with the consent of the Senior Secured Lender (defined below), in order to continue the Debtors' operations during the Chapter 11 Cases; (ii) preserving customer relationships; (iii) maintaining vendor confidence and employee morale; (iv) ensuring the continuation of the Debtors' cash management systems and other business operations; and (v) establishing certain administrative procedures to facilitate a smooth transition into chapter 11.

4. I submit this declaration (the "Santore Declaration") in support of the First Day Motions. I am familiar with the contents of each First Day Motion, including the exhibits attached thereto, and believe that the relief sought is (i) necessary to preserve the value and productivity of the Debtors' operations, (ii) integral to the proposed sale of substantially all the Debtors' assets to maximize value for all of the Debtors' stakeholders, and (iii) in the best interests of the Debtors' estates, their creditors and other parties-in-interest.

5. Except as otherwise indicated herein, all statements set forth in this First Day Declaration are based on: (i) my personal knowledge as the CEO of the Debtors' operations and financial affairs; (ii) materials provided by, as well as discussions with, members of my executive and field management teams; (iii) information provided by the Debtors' advisors; or (iv) information obtained from my review of relevant documents. Additionally, the opinions asserted in this First Day Declaration are based on my experience and knowledge of the Debtors' operations, financial condition and liquidity. If called upon to testify, I could and would competently testify to

107770624.1                                      2

the facts and opinions set forth in this First Day Declaration. I am authorized to make the statement in and submit this First Day Declaration on behalf of each of the Debtors.

6. Section I of this Declaration provides an overview of these Chapter 11 Cases and the Debtors' proposed course for the Chapter 11 Cases. Section II describes the Debtors' business. Section III describes the Debtors' capital structure. Section IV describes the circumstances giving rise to the commencement of these Chapter 11 Cases. Section V sets forth certain facts in support of the First Day Pleadings.

### SECTION I
### OVERVIEW OF THE CHAPTER 11 CASES AND THE DEBTORS' PROPOSED COURSE FOR THE CHAPTER 11 CASES

7. The Debtors' objectives in these Chapter 11 Cases are to maximize the value of the Company's assets for the benefit of all stakeholders and to maintain the business as a going concern, thereby preserving dozens of jobs and important customer relationships.

### SECTION II
### OVERVIEW OF THE DEBTORS' BUSINESS

**Debtors.**

Debtors are THE MEDICAL DIAGNOSTIC IMAGING GROUP, LTD., an Arizona Professional Corporation ("**MDIG**") and MDIG OF ARIZONA, LLC, an Arizona Limited Liability Company ("**MDIG AZ**").

**Debtors' Business.**

*MDIG.* MDIG is a 32-year-old hospital-based radiology practice providing both diagnostic interpretive as well as vascular and interventional radiology services to hospitals in Arizona and New Mexico. This practice bills payors (insurance carriers) and patients directly for the services its physicians provide to the in-patient and out-patient population of each hospital customer. The entity is not paid by the facility (hospital customers) for the services it provides to the communities it serves. This entity also provides diagnostic interpretive services to a select group of facilities via tele-radiology (telemedicine) and in

107770624.1                                      3

those cases, it bills the hospitals directly for the services it provides. MDIG only employs physicians and does not employ any other support staff. Expenses include Physician Salaries, Malpractice Insurance, 18% management fees to AMMS (Advanced Medical Management Solutions, LLC – a related entity) for Administrative Support and 5% billing fees to AMMS for billing (revenue cycle management) for billing patients and insurance carriers. Both the billing fees and the management fees are necessary to keep the company in business and the amounts being charged fall well within Fair Market Value. Between 2017 and 2019 this company lost in excess of 27-million dollars of revenue per year due to the voluntary and involuntary loss of contracts with hospitals.

*MDIG AZ.* MDIG AZ is a 2-year-old hospital-based radiology practice providing both diagnostic interpretive as well as vascular and interventional radiology services to hospitals in Arizona. This practice bills payors (insurance carriers) and patients directly for the services its physicians provide to the in-patient and out-patient population of each hospital customer. The entity is not paid by the facility (hospital customers) for the services it provides to the communities it serves. In all cases services are provided on-site at each hospital by medical physicians licensed to practice medicine in the State of Arizona. Expenses include Physician Salaries, Malpractice Insurance, 18% management fees to AMMS for Administrative Support and 5% billing fees to AMMS for billing (revenue cycle management) for billing patients and insurance carriers. Both the billing fees and the management fees are necessary to keep the company in business and the amounts being charged fall well within Fair Market Value. This is a start-up company that was created in order to make up for revenue losses experienced by MDIG, Ltd. Due to changes in the market, start-up costs have exceeded initial projections and this practice entity has not generated sufficient revenue to cover its operational overhead.

## SECTION III
## EVENTS LEADING UP TO BANKRUPTCY

I, Patrick F. Santore, Jr. joined MDIG, Ltd. As its Chief Administrative Office in late July of 2017. I was charged with managing the day-to-day operations of the practice as well as with increasing its geographic footprint, creating new practice entities and establishing a Medical Services Organization (MSO). I participated in every MDIG, Ltd. Board Meeting, however I was not, nor have I ever been a Member of the MDIG, Ltd. Board, nor have I held ownership in any MDIG or AMMS entity, nor have I been a Fiducial of the Cash Balance Plan or other Pension Plan. My participation in MDIG, Ltd. was limited to providing the MDIG Board with Advice and Counsel as related to business matters. I did not have a vote, nor did I involve myself with any clinical matters as I am a non-physician and therefore, I cannot opine on medical matters. At all times, and as related to MDIG and AMMS matters I have reported directly to each entity's Board of Directors, primarily to the then current President, Barry Sadegi, MD.

In August of 2017 I was made aware that MDIG was experiencing conflict with a former hospital customer, Cancer Treatment Centers of America (CTCA). I advised the MDIG Board that it would be in MDIG's best interest to meet with CTCA leadership for the purpose of coming to an amicable resolution. The Board agreed and members of the Board which included past president, Barry Sadegi, MD as well as Aaron Wittenberg, MD and Christian Ingui, MD and I met with the then current CEO as well as the then current Radiology Director of CTCA. The meeting resulted in a stale mate and no compromise or resolution was achieved. CTCA subsequently filed a lawsuit against MDIG, Ltd. alleging unjust enrichment. The MDIG Board and I agreed that we would need to defend the practice against this false allegation and contracted Sherman and Howard to aid in our defense as well as to file a counter law-suit against CTCA as they had failed to appropriately pay MDIG for the final three months of the professional radiology services agreement. It is important to note that this lawsuit is presently active and as of yet, unresolved.

Given the lawsuit against MDIG, Ltd. it became imperative to grow the practice in other markets in order to ensure its future existence in the unlikely event that CTCA would prevail in its suit against the practice. MDIG actively engaged in the process of expanding

107770624.1                              5

its geographic footprint and was awarded its first new Professional Radiology Services agreement in the Texas market with Doctors Hospital of Laredo in Laredo Texas. This agreement was projected to earn the practice approximately 1.5 million dollars per year in gross revenue and net the practice approximately $200,000.00 of profit per year. The valuation was made based on the staffing requirements of the facility as well as on the payor mix, modality mix and volume provided to the practice by the hospital. In order to support this agreement, the practice established MDIG of Texas, a Texas-based corporation to hold the professional services agreement with the facility. AMMS was also formed to provide billing and management services to this new MDIG entity. Initially MDIG performed well at this location, however due to its inability to recruit permanent physicians into the practice location, over-utilization of locum tenems physicians as well as outsourced teleradiology physicians, the costs associated with operating this location soon exceeded any revenue being generated by the practice.

While operating in Texas and prior to the notable losses experienced at Doctors Hospital of Laredo, MDIG was subsequently awarded a second contract in Texas with North West Texas Health Systems to provide on-site and after-hours remote professional radiology services to this Amarillo-based hospital facility. Unlike Laredo, MDIG was able to absorb three existing radiologists already providing coverage to the facility and only had to recruit one physician to complete the on-site staffing requirement. As with Laredo, it was expected that North West Texas Health Systems would make a positive contribution to the MDIG bottom-line. This assumption was made based on the staffing requirements, payor mix, modality mix and volume information provided to MDIG by the facility. Likewise, AMMS was engaged to provide the revenue cycle management and operations management services to this facility. The information provided to MDIG by North West Texas Health Systems was flawed, the physicians absorbed by MDIG at the request of the facility were non-productive and the overhead required to support the location was greater than the revenue being generated.

As of December 2, 2019 MDIG, of Texas no longer services North West Texas Health Systems and will be terminating its relationship with Doctors Hospital of Laredo. The end of these relationships will impact AMMS as it will no longer receive management fees of 18% or billing fees of 5%.

In November of 2018 MDIG was again awarded an agreement in a new market. Specifically, MDIG was awarded to professional radiology services agreement with Sharon Regional Medical Center, in Sharon, Pennsylvania. As with the Texas locations, a new practice entity, MDIG of PA, LLC was created and AMMS was engaged to provide revenue cycle management as well as operational management services to this location. Further, it was expected that this location would be cash-flow positive. A valuation based on staffing requirements, payor mix, modality mix and annual volume was generated. MDIG was required to provide a total of two on-site radiologists to cover the facility and made significant efforts to do so. MDIG also entered into a joint venture with this facility for the purpose of building a multi-modality outpatient imaging center to serve the needs of the community. The total investment to enter the joint venture was projected at 4.7 million dollars. Funding was obtained through a banking relationship with First National Bank of Pennsylvania through a "construction" loan. The accounts receivables for this facility were used to secure the loan. Due to changes in the radiology market, wherein there exists an excess of unfilled positions for physician radiologists and a shortage of radiologists to fill those open positions, MDIG was unsuccessful in its efforts to recruit and hire two on-site radiologists to cover this location. As a result, the practice experienced significant overhead in its operations of this practice and was never able to generate a profit. As of December 6, 2019, the facility has been notified by MDIG that it is terminating its relationship without cause and will no longer provide services to the location once the 90-day notice period is concluded. The end of this relationship will again impact AMMS as it will no longer receive the 5% billing fees or the 18% management fees it would otherwise generate from this location.

107770624.1

7

In early 2019 MDIG was awarded a contract to provide on-site and after-hours radiology services to four Phoenix-based locations, Mountain Vista Medical Center, Mountain Vista Medical Center at Florence, Phoenix St. Luke's as well as Tempe St. Luke's. As with the other new locations, a valuation was generated based on staffing requirements, payor mix, modality mix and annual volumes and it was expected that these sites would also make a positive contribution to the MDIG bottom line. A new practice entity, MDIG of Arizona, LLC was established to support these locations and AMMS was engaged to provide management and billing services to the practice entity. Given that these new locations were Phoenix based locations there was an expectation that existing Phoenix-based radiologists would cover these sites. They did not and as a result, MDIG experienced over-utilization of locum physicians, outsourced teleradiology and internal moonlighting costs to cover the locations. MDIG of Arizona is in the process of ending its contractual relationships with these sites. The end of these relationships will further impact AMMS in that the AMMS company will no longer receive the 5% in billing fees and the 18% in management fees it previously generated from these sites.

In 2018 MDIG was also awarded a hospital based professional radiology services agreement in the State of Washington by Lourdes Medical Center in Pasco, WA and was subsequently awarded a secondary agreement with Kittitas Valley Health Care in Ellensburg, WA. MDIG of WA, LLC was created and AMMS was engaged to provide billing and management services to these entities. Lourdes Medical Center terminated its relationship with MDIG in early 2019 and MDIG terminated its relationship with Kittitas effective as of January 1, 2020. The end of these relationships impacts AMMS in that they will no longer receive billing and management fees for providing support to this practice entity.

As MDIG continued to expand in other markets, the original MDIG, Ltd. entity continued to experience significant financial losses. Between 2018 and 2019 the MDIG, Ltd. entity lost a total of $21,393,788.98 in gross revenue above the revenues lost above.

These losses were due to a combination of voluntary and involuntary terminations of professional radiology service agreements with other customers including; Advanced Radiology Healthcare, Florence and Gilbert Hospitals, Warner, Focused Imaging of Arizona, Alliance Imaging, Canyon Vista Medical Center, Sierra Vista Medical Center, White Mountain Regional Medical Center, Honor Health North Mountain, VA Hospital, Honor Health Deer Valley as well as others.

AMMS, the company created by MDIG to provide dedicated billing and management services to the MDIG practices failed in its efforts to maximize revenue. The Departmental Leadership of that company failed to timely address billing related matters, to notify leadership of decreased reimbursements as well as to proactively engage in the resolution of such matters. The result of the same is losses of millions of dollars in unrealized revenue due to the poor billing practices by that entity on behalf of MDIG practices. MDIG intends on either re-structuring AMMS or closing it altogether once all accounts receivables are collected.

## IMPACT OF CONTRACT AND REVENUE LOSSES

The losses in revenue resulted in significant pay-cuts being made to Physician Partner salaries. Partners previously earning base salaries of $480,000.00 per year experienced an initial pay cut down to $450,000.00 per year and in January, 2019 and additional pay cut to $180,000.00 per year. These decreased physician partner salaries caused may physicians to voluntarily leave the practice which created significant stress on the practice as fewer physicians found themselves having to do more work. This created delays in report turn-around-times, quality issues and additional contract losses which ultimately resulted in more physicians departing the practice. Some of the departing physicians filed lawsuits against the practice alleging breach of contract, unpaid salaries, due, etc. This created further stresses to the practice and created a pathway for Cancer Treatment Centers of America (CTCA) to make further allegations against MDIG. To that end CTCA filed a second suit against the practice secondarily naming AMMS and MDIG of AZ alleging fraudulent transfer. This additional lawsuit when combined with other

107770624.1                                    9

pending lawsuits against the practice by former physicians have further increased costs and losses. MDIG has spent in excess of 2-million dollars in the last 2-years to defend itself and is presently indebted to its own legal counsel. Neither AMMS nor MDIG are able to meet their financial obligations to other parties and both entities are in danger of subsequent filings for breach of contract and or for failure to meet their financial obligations.

The shareholders of MDIG in January 2018 had determined based on the clinical schedule that there would not be monthly vacation weeks for the partners and that the clinical schedule would be requiring them to work more than they wanted to. The position owners then voted to have stipend payments made on a monthly basis for these additional shifts and in hospital call.

The board of MDIG adopted this plan for additional payments for physicians who were working night shifts at the honor health facilities in Phoenix, payments for vacation weeks not received each month, payments for additional shifts worked, and additional payments for travel to hospital sites that were away from their primary practice site. These amounts were significant. In total there was $2.5 million approximately spent during the course of 2018 on these additional payments to physician owners. All of these position owners including board members are no longer with the practice having resigned during the first half of 2019.

In November 2017 the MDIG Board also voted, against my advice, to offer severance payments to physicians in exchange for their resignations. At that time it was estimated that we had inappropriate allocation of physicians after having lost hospital contracts. This was decided that it would be nine months of partners' base pay offered to be paid out monthly, $40,000 per month. Three physicians ended up agreeing to this severance package and the total was approximately $1.2 million of additional expenditure.

These expenditures in addition to legal fees spent during the course of 2018 total $4.6 million.

Case 2:19-bk-15722-DPC    Doc 9    Filed 12/16/19    Entered 12/16/19 12:20:52    Desc
Main Document    Page 10 of 12

# SECTION IV
## FACTS IN SUPPORT OF FIRST DAY PLEADINGS[1]

1. To minimize the adverse effects of the commencement of the Chapter 11 Cases on the Debtors' ability to effectuate a timely and efficient restructuring process that will preserve and maximize the value of the Debtors' estates, the Debtors have filed the following "First Day Motions":

- Debtors' Emergency Motion for Entry of Interim and Final Orders Concerning Pre-Petition Bank Accounts;
- Debtors' Emergency Motion for Entry of Interim and Final Orders: (a) Authorizing Debtors' Use of Cash Collateral; (b) Granting Adequate Protection; and (c) Scheduling a Final Hearing Thereon;
- Debtors' Motion for Joint Administration;
- Debtors' Application to Employ Counsel; and
- Debtors' Motion to Establish Procedure for Interim Compensation and Reimbursement of Expenses Due Certain Professionals.

2. I have reviewed each of the First Day Motions, including any exhibits thereto, and incorporate by reference each of the factual statements set forth in the First Day Motions. I believe that the relief requested by the First Day Motions is necessary to enable to the Debtor to preserve and maximize value and efficiently implement their restructuring efforts with minimal disruption and delay.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on this 16th day of December, 2019.

By: /s/Patrick Santore
PATRICK SANTORE
Chief Executive Officer

---

[1] Capitalized terms used but not otherwise defined in this Section V have the same meanings given to such terms as in the respective First Day Motions.

107770624.1

11

COPY of the foregoing emailed
this 16th day of December, 2019 to:

Office of the U.S. Trustee
230 North First Avenue, Suite 204
Phoenix, AZ 85003

Lindsi Weber, Esq.
Polsinelli
One E Washington
Suite 1200
Phoenix, AZ 85004
Email: lweber@polsinelli.com

AND

COPY of the foregoing mailed this
16th day of December, 2019 to the List of
20 Largest Unsecured Creditors on file in each
of the above-captioned cases.


By *Sharon D. Kirby*